UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JEAN-ETIENNE DE BECDELIEVRE and TAMS-WITMARK MUSIC LIBRARY, INC.<br><br>Plaintiffs,<br><br>against<br><br>ANASTASIA MUSICAL LLC and TERRENCE McNALLY,<br><br>Defendant. | Case No. 1:16-cv-09471-AKH<br><br>**FIRST AMENDED COMPLAINT<br>AND JURY DEMAND** |

Plaintiffs Jean-Etienne de Becdelievre ("de Becdelievre") and Tams-Witmark Music Library, Inc. ("TWML"), by and through their respective attorneys, Rosenberg & Giger P.C. and Manatt, Phelps & Phillips, LLP, as and for their Complaint against defendants Anastasia Musical LLC ("AML") and Terrence McNally ("McNally"), allege and aver as follows:

## NATURE OF THE ACTION

1.  Through this action, the heir (and owner of the copyright interests) of the acclaimed French author and playwright Marcelle Maurette and the successor-in-interest (and owner of copyright interests) of the well-known British-American playwright and writer Guy Bolton seek redress from AML and McNally (collectively, "Defendants") for their knowing and willful copying of critical components of the play *Anastasia* (the "Play") through McNally's authorship and AML's production of a Broadway musical bearing the same name (the "Musical"). As described below, despite a manifest lack of authority to do so, Defendants have copied significant portions of the plot, scenes, characters, dialogue and other original elements of the Play, and have refused a specific request to enter into a license agreement to permit them to

use those elements of the Play in the Musical. As redress for Defendants' wholesale infringement of de Becdelievre's and TWML's (collectively, "Plaintiffs") copyright in *Anastasia*, Plaintiffs seek through this action an injunction enjoining the performance of Defendants' Musical or any other exploitation of the Play, and damages and attorneys' fees pursuant to the Copyright Act, 17 U.S.C. § 501 *et seq*.

## PARTIES

2. De Becdelievre is the sole owner of the copyright interests of the late French author and playwright Marcelle Maurette. De Becdelievre is a citizen and resident of France.

3. TWML is a corporation organized under the laws of the State of New York, with its principal place of business in New York, New York. TWML is the successor-in-interest to the copyright interests in the English adaptation of the Play held by the late British-American playwright and writer Guy Bolton.

4. On information and belief, McNally is a resident of New York, New York. McNally is a playwright and the author of the "book" for the Musical - - *i.e.*, the non-musical aspects of that work, including the Musical's plot, characters and dialogue.

5. AML is a limited liability company organized under the laws of the State of New York, with its principal place of business in New York, New York. AML purports to be the owner of the copyright and other rights in the Musical.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as the claims asserted herein arise under the laws of the United States, specifically, the Copyright Act, 17 U.S.C. § 501.

7. Venue is proper in this judicial district pursuant to, *inter alia*, 28 U.S.C. §§ 1391(b)(1) and (b)(2) in that defendants reside in this judicial district and a substantial portion of the events and omissions giving rise to Plaintiffs' claims occurred in this district.

**FACTS COMMON TO ALL CAUSES OF ACTION**

Origins of the *Anastasia* Play

8. Marcelle Maurette ("Maurette") was a prominent French author, playwright and screenwriter during the early to mid-twentieth century.

9. Guy Bolton ("Bolton") was a highly-regarded British-American playwright and writer whose career spanned most of the twentieth century.

10. In the 1940s, Maurette wrote the original, French-language version of the Play (the "French Version"). Thereafter, the French Version by Maurette was published in English as adapted by Guy Bolton (the "English Version"). (Except where otherwise specified herein, references to the "Play" shall include the French Version and the English Version, individually and collectively.) The Play, which was first published in the United States in 1952, is a fictionalized account of a young woman who claims that she is Russian Grand Duchess Anastasia Romanov, and that she survived the execution of Czar Alexander Romanov and his family by communist revolutionaries in 1918.

11. While the Play is loosely based, in part, on certain historical events - - *i.e.*, the phenomenon of imposters claiming to be surviving Romanov children - - the Play's plot, scenes, dialogue and (with few exceptions) characters are entirely original and fictitious.

12. De Becdelievre is the sole owner of the worldwide copyright in the French Version, and co-owns, with TWML, the worldwide copyright in the English Version of the Play.

13. On or about August 26, 1948, the French Version was registered for copyright protection in the United States as an unpublished work in the name of Maurette (Entry No. DU: 17447). On or about March 1, 1956, the French Version was registered for copyright protection as a published work, also in the name of Maurette (Entry No. DFO: 610).

14. The English Version of the Play was registered for copyright protection in the United States in the names of Maurette and Bolton on or about July 18, 1952 (Entry No. DU: 31525).

15. The copyright registrations in the French Version and the English Version have been renewed in accordance with the Copyright Act, and remain effective and valid as of the date of the commencement of this action. The Play is also the subject of additional copyright registrations (Entry Nos. DFO: 401, DP: 2141, DP: 2584, DU: 36009), for which renewal registrations were also filed in accordance with the Copyright Act.

Licensing and Assignment of Film Rights in the Play

16. In addition to being recognized as an important literary work, the Play has been licensed within the United States for stage productions, films and other uses.

17. In this regard, and without limitation, limited motion picture and related rights in the Play were granted to Twentieth Century-Fox Film Corporation ("TC-Fox"), resulting in a film released by TC-Fox in 1956, and an animated feature film released by TC-Fox in 1997.

18. Regarding the 1956 film, on or about July 15, 1955, Maurette, Bolton and Laurence Olivier Productions Ltd. ("LOPL"), which had staged an English-language version of the Play in London, England, licensed to TC-Fox certain motion picture and allied rights in all versions of the Play, including the French Version and the English Version (the "1955 License Agreement").

19. Specifically, in the 1955 License Agreement, Maurette, Bolton and LOPL licensed to TC-Fox, on an exclusive basis and for an eight-year term, certain limited motion picture and allied rights in both versions of the Play - - "as their respective interests may appear" - - including the right to produce and publicly distribute and display a film based upon or incorporating elements of the Play (the "Motion Picture Rights").

20. Relying upon and exploiting the Motion Picture Rights licensed to it in the 1955 License Agreement, in 1956 TC-Fox produced and released a major motion picture, starring Ingrid Bergman and Yul Brynner, entitled *Anastasia*, for which Ms. Bergman won the Academy Award for Best Actress.

21. In or about July 1963, TC-Fox exercised an option granted in the 1955 License Agreement to acquire the Motion Picture Rights by way of assignment. As a result, TC-Fox purchased, and continues to possess, the limited Motion Picture Rights in the Play, as defined by and set forth in the 1955 License Agreement.

22. The 1955 License Agreement did not grant to TC-Fox, and expressly reserved to Maurette, Bolton and LOPL, "as their respective interests may appear, all rights in the Play which are not granted to [TC-Fox] under this agreement, which reserved rights include, but are not limited to, rights to production on the spoken stage . . . ." As a result, TC-Fox did not acquire - - and thus does not possess - - any "rights to production [of the Play] on the spoken stage" when it exercised its option to purchase the Motion Picture Rights.

23. In or about September 1993, the Estate of Marcelle Maurette ("the Estate"), together with TWML, entered into a further agreement with TC-Fox entitled Assignment Agreement (the "1993 Assignment Agreement").

24. The 1993 Assignment Agreement recited and provided that, because "certain motion picture rights granted to [TC-Fox] pursuant to the [1955 License Agreement] may have reverted or, in the future may revert" to the Estate or TWML, those parties assigned to TC-Fox "all . . . present and future right, title and interest in and to the Motion Picture Rights" set forth in the 1955 License Agreement.

25. In 1997, relying, in part, on the rights granted to it in the 1993 Assignment Agreement, TC-Fox produced and released an animated film entitled *Anastasia*, which is based upon and incorporates numerous creative elements of the Play (the "1997 Animated Film").

26. De Becdelievre and TWML, respectively, presently possesses all rights of Maurette and Bolton in the Play.

TC-Fox's Confirmation That it Does Not Possess Live Performance Rights in the Play

27. On information and belief, in or about 1998, TC-Fox entered into an agreement with Ringling Bros. Barnum & Bailey Combined Shows, Inc. ("Ringling Bros.") to produce and perform a live ice skating show based upon the 1997 Animated Film (the "Ice Show").

28. On information and belief, between September of 1998 and May of 1999, the Ice Show was performed in over 30 venues across the United States.

29. In or about January of 2002, a dispute arose between Plaintiffs, on the one hand, and TC-Fox, on the other hand, concerning TC-Fox's purported licensing to Ringling Bros. of the right to use the Play in connection with the Ice Show, as TC-Fox did not possess the right to authorize live performances of any components of the Play, in light of the limited nature and scope of the Motion Picture Rights that TC-Fox had acquired. The parties resolved that dispute in 2002, and memorialized their accord in a written agreement dated April 23, 2002 (the "Ice Show Agreement").

30. In the Ice Show Agreement, TC-Fox explicitly acknowledged and confirmed that the 1955 License Agreement did not grant any stage or similar live performance rights to TC-Fox, but had "reserv[ed] all rights to present productions of the [French Version] and English Version upon the spoken stage" for Maurette and TWML, according to their respective interests. TC-Fox further acknowledged and confirmed in the Ice Show Agreement that "de Becdelievre is the sole proprietor of the United States copyright in the [French Version], and de Becdelievre and Tams-Witmark are joint proprietors of the United States copyright in the English Version."

31. As a result of TC-Fox's acknowledged lack of authority to license to Ringling Bros. the right to use the elements of the Play in the Ice Show, and as a component of the parties' settlement, in the Ice Show Agreement, Plaintiffs issued a "retroactive license" to TC-Fox in exchange for substantial financial consideration. This license retroactively authorized the "creation, production and performances of the Ice Show," solely for the period during which the Ice Show had already been performed, but expressly excluded the "right to produce or authorize production of any future presentations of the Ice Show," and reserved all other rights in the Play to Plaintiffs.

Defendant's Development of the Infringing Musical

32. Following the execution of the Ice Show Agreement, TC-Fox entered into an agreement with AML (the "Musical Agreement") in which TC-Fox "quitclaimed" to AML whatever rights that TC-Fox owned to "produce and exploit the Play." In the Musical Agreement, AML, "acknowledge[d] that the rights granted" by TC-Fox "are granted by quitclaim and are deemed granted only to the extent of [TC-Fox's] right, title and interest therein."

7

33. Because TC-Fox possessed only certain limited motion picture-related rights in the Play and never possessed the right to produce presentations of the Play on the spoken stage (as it expressly acknowledged in the Ice Show Agreement), it could not - - and did not purport to - - transfer any such "spoken stage" rights to AML in the Musical Agreement.

34. Despite lacking any license or other right to present the Play on the spoken stage, AML entered into agreements with defendant McNally and others to create the Musical, which has been and will be presented on the "spoken stage" - - *i.e.*, by live theatrical performance.

35. McNally is the author of the "book" for the Musical, which consists of the elements of the script for the Musical other than the music and song lyrics - - *e.g.*, the characters, plot, stage direction and spoken dialogue.

36. While the Musical ostensibly is a Broadway stage adaptation of both the 1956 motion picture and the 1997 Animated Film - - and has been promoted as such - - the Musical includes multiple characters, plots line and other creative elements that are original to the Play.

37. AML has not obtained a license or other authorization to create and present a live stage musical incorporating these original elements of the Play, including, without limitation, those described in detail below, which are protected by the federally registered copyright in the Play.

38. In or about March 2016, attorneys for de Becdelievre engaged in negotiations with counsel for AML and/or related parties concerning a license from de Becdelievre authorizing the use of the copyright-protected elements of both versions of the Play in the creation and performance of the Musical. In early 2016, counsel for AML and/or related parties also contacted TWML expressing interest in obtaining a license from TWML for the same purpose. The parties were not able to agree to the terms of such a license.

39. Despite failing to obtain a license, Defendants pressed forward with the creation and presentation of the Musical with full knowledge, and in disregard, of Plaintiffs' copyright interests in the Play.

40. The Musical has already been performed on stage before live audiences. On May 13, 2016, "previews" of the stage production of the Musical were presented at The Hartford Stage in Hartford, Connecticut. Following these preview performances, a limited engagement of the Musical ran in Hartford from May 27 through June 19, 2016.

41. Building upon its successful run in Hartford, the Musical had previews on March 23, 2017 at the Broadhurst Theatre on West 44th Street in New York City, and officially opened on Broadway at that theater on April 24, 2017.

42. Tickets for the Musical are presently on sale, among other places, through the website "anastasiabroadway.com."

## COUNT I
## Copyright Infringement (17 U.S.C. § 501)

**(Against Both Defendants)**

43. Plaintiffs incorporate by reference in their entirety all of the preceding paragraphs of this First Amended Complaint, as if fully set forth herein.

44. De Becdelievre is the owner of the copyright in the French Version, and Plaintiffs co-own the copyright in the English Version thereof (collectively, the "Works").

45. As set forth above, the Works have been duly registered with the United States Copyright Office in accordance with the Copyright Act, 17 U.S.C. § 101 *et seq*.

46. The Works are original works of authorship, do not infringe any pre-existing works, and are fixed in tangible media (*e.g.,* in physical books and electronic texts).

9

47. Defendants have infringed Plaintiffs' copyrights in the Works by, *inter alia*, copying and improperly appropriating a number of critical original elements of the Works that are protected by copyright, and by using and incorporating those elements in the script for the Musical and in live performances based on that script.

48. The Works are widely available, and defendant had access to the Works through numerous means, including from book vendors and libraries and on the Internet. In addition, videos of live performances of the Works, including individual scenes, are available for viewing on the Internet.

49. The script for the Musical is substantially similar to the Works, and copies numerous original, creative elements of the Works, including plot, scenes, characters and dialogue.

50. In this regard, the plot lines, scenes and characters of the Works and the Musical are remarkably similar, and can be summarized as follows: A young, earnest woman living in Europe in the mid-1920s suffers from partial or evolving amnesia concerning her past. She believes, but is not certain, that she may be princess Anastasia Romanov, the eldest daughter of Czar Nicholas II of Russia, who was executed along with his family members in 1918 by communist forces. This young woman is reluctantly swept up in a scheme to present her to the "Dowager Empress" - - the Czar's mother, who escaped execution and is exiled in Europe - - as princess Anastasia, who purportedly survived the Romanov execution and escaped Russia. This scheme is controlled by a group of men, one of whom had connections to the Romanov royal court, who are pursuing their plan in expectation of an identified monetary reward or designated inheritance. The men tutor the young woman to behave like royalty and they provide her with detailed information that allows her to recognize people and demonstrate familiarity with events

that would be known to the real Anastasia, and they are astounded to learn that she already knows certain information of this type that they have not yet imparted to her.  The goal of these tutorials is to prepare the young woman for her meeting with the Dowager Empress, who will be the final arbiter of whether the young woman should be recognized and accepted as princess Anastasia.  During this "tutoring" process, the young woman struggles with the uncertainty of her identity and the prospect that her claim to be princess Anastasia will be rejected.  At the meeting between the Dowager Empress and the young woman, in an emotional scene that is the dramatic climax of both the Works and the Musical (the "Recognition Scene") - - and which has no historical basis, but is an entirely fictional encounter appearing in the Play - - the Dowager Empress recognizes the young woman as princess Anastasia.[1]  Yet, despite this recognition and substantial preparations for her public "presentation" as princess Anastasia, the young woman runs away with her love interest just before that public presentation, thus choosing her "true identity."

      51.    In addition to these substantial, indeed remarkable, similarities in the overarching plot and characters of the Works and the Musical, the Works and the Musical contain additional similarities in the following specific elements, which are proffered for illustrative purposes and are not intended to reflect an exhaustive recitation of all of the similarities between the Works and the infringing Musical:

    a.    The events take place in 1926 (in the Works) or 1927 (in the Musical).

    b.    The protagonist uses, or has used, the name "Anya."

    c.    The young woman recounts that, prior to the events depicted, she awoke with amnesia in a hospital.

---

[1] Samuel French published the Recognition Scene as a standalone script, entitled "Recognition Scene from Anastasia", which was registered for copyright protection in the United States on or about December 20, 1955 (Entry No. DF: 895) and for which a renewal registration was filed in accordance with the Copyright Act.

d. In addition to suffering from amnesia, the young woman is a poor girl with no family connections.

e. The young woman "auditions" for the men who lead the scheme, who are actively searching for an imposter to present as princess Anastasia.

f. One of the men involved in the scheme had previously seen the real Anastasia in person when she was a young girl, and he discusses this with the young woman.

g. There is a reference to precious jewels that were sewn into the fabric of princess Anastasia's clothes at the time of the execution of the Romanov family, which the young woman and those assisting her used to fund her travels.

h. The leader of the scheme is a man with a connection to the Romanov royal court and a reputation as a scoundrel and "ladies man":  compare the character "Prince Bounine" in the Works with "Vlad" in the Musical.

i. Reference is made to a love interest between this royal "ladies man" and the Dowager Empress's attendant:  compare (1) "Prince Bounine" and "Baroness Livenbaum" in the Works with (2) "Vlad" and "Lily" in the Musical.

j. At the beginning of the Recognition Scene (which, as noted above, is an entirely fictionalized element of the Play), the Dowager Empress comments that the young woman is not sincere, but is acting:  compare (1) "You all cry at some point.  Do you rehearse?" (Musical) with (2) "Depuis quand etes vous actrice?" (*i.e.*, "How long have you been an actress?") (French Version).

k. At the beginning of the Recognition Scene, the Dowager Empress is extremely cruel toward the young woman, causing the young woman to express distress and surprise:  compare (1) "I didn't think you'd be so cruel" (Musical) with (2) "How can someone who has suffered so much have so little heart for suffering?" and referring to "the wounding words, barbed like arrows" (English Version).

l. During the Recognition Scene, the Dowager Empress, who previously has reviewed multiple false claims by imposter Anastasias, becomes weary and skeptical of further claims:  compare (1) "I have already been shown two Tatianas, an Alexis, and a Marie.  I am a little weary of these spectral Romanovs" and "I have received quite a few appeals from resurrected Romanovs" (English Version) with (2) "[A]fter so many disappointments, I've come to dread the daily post.  Another day, another imposter" (Musical).

m. During the Recognition Scene, the nickname used by princess Anastasia for the Dowager Empress plays a role in the latter's recognition of the young woman: compare (1) "I was never 'Grandmama'; I was 'Nana'" (Musical) with (2) references to "Grandmamma" as the name for the Dowager Empress used by princess Anastasia (English Version).

12

n. In the Recognition Scene, the Dowager Empress accuses the young woman of being "clever":  compare (1) "You are too clever for me" (English Version) with (2) "You're clever, I'll grant you that" (Musical).

o. The Dowager Empress's ultimate recognition of the young woman as princess Anastasia turns, in part, upon her surprise that the young woman uses certain nicknames for royal family members that were known only to the Romanovs:  compare (1) "How did you learn to call the great Catherine 'Figgy'? . . . "We always called her that" (English Version) with (2) "She was 'mamma' to me.  She was 'mamma' to all of us" (Musical).

p. Upon her recognition of the young woman as princess Anastasia, the Dowager Empress comments dramatically on how long she has waited for that moment:  compare (1) "You've come from so far away and I waited and waited and waited" (English Version) with (2) "What took you so long?" and "Too late, you've come too late" (Musical).

q. At the end of both the Works and the Musical, the Dowager Empress remarks that the young woman will never be seen again:  compare (1) "It will do you no good to go after her.  She won't come back.  She will never come back" (English Version) with (2) "I think we have seen the last of that young woman" (Musical).

r. Following the disappearance of the young woman, the Dowager Empress makes, or proposes to make, an extremely similar public announcement:  compare (1) "As of today, there will be no more Anastasias," announced at a press conference (Musical), with (2) "Vous annoncerez au monde: j'ordonne: Le monde ne connaitra plus Anastasia Nicolaievna" (*i.e.*, "Announce to the world:  I command: the world will no longer know Anastasia Nicolaievna") (French Version).

s. Both the Works and the Musical conclude on a wistful, nostalgic note, with the Dowager Empress invoking old memories of princess Anastasia:  compare (1) "You wanted her as she was, keep her as she was, a yellowing photograph of a girl in a white pijue dress waving goodbye from the bridge . . . ." (English Version) with (2) a reference to the return of Anastasia as "[a] beautiful dream" and the singing of song lyrics, "Things my heart used to know; once upon a December" (Musical).

52. On information and belief, Defendants were aware when they wrote, produced and performed the Musical, and are presently aware, (a) of the existence of the Works; and (b) that the "quitclaim" agreement with TC-Fox did not convey any rights to use the Works, or incorporate copyright-protected elements thereof, in the Musical for performance on the spoken stage.  On information and belief, Defendants knowingly and willfully copied the Works, and

13

certain original elements thereof, with full knowledge that they lacked any license or other authority to do so.

53. By reason of the foregoing, Defendants have infringed Plaintiffs' copyrights in the Works.

54. As a result of the aforesaid infringement of Plaintiffs' copyrights in the Works, Plaintiffs have been damaged in an amount to be determined at trial.

## COUNT II
### Contributory Copyright Infringement

### (Against Defendant AML)

55. Plaintiffs incorporate by reference in their entirety all of the preceding paragraphs of this First Amended Complaint, as if fully set forth herein.

56. In addition to directly infringing Plaintiffs' copyrights in the Works by staging and presenting performances of the Musical, defendant AML's conduct constitutes contributory infringement, derivative of defendant McNally's direct infringement of the Works through his creation of the book for the Musical (the "Musical Book").

57. In this regard, albeit without limitation, AML induced, caused or otherwise materially contributed to McNally's creation of the Musical Book, *inter alia*, by hiring McNally to create the Musical Book and, upon information and belief, by exercising authority to review, revise and approve the content of the Musical Book.

58. AML induced, caused or materially contributed to the creation of the Musical Book with full knowledge that neither AML nor McNally had obtained any license or other authority to utilize the original, copyright-protected elements of the Play to create the Musical Book.

59.     As a result of AML's contributory infringement of Plaintiffs' copyrights in the Works, Plaintiffs have been damaged in an amount to be determined at trial.

## COUNT III
## Vicarious Copyright Infringement

### (Against Defendant AML)

60.     Plaintiffs incorporate by reference in their entirety all of the preceding paragraphs of this First Amended Complaint, as if fully set forth herein.

61.     In addition to liability for direct infringement of Plaintiffs' copyright in the Works by staging performances of the Musical, AML is vicariously liable for McNally's direct infringement of the Works through his creation of the infringing Musical Book.

62.     In this regard, on information and belief, AML possessed the right and ability to supervise or control McNally's creation of the infringing Musical Book pursuant to AML's agreement with McNally.

63.     AML has received, and will continue to receive, direct financial benefit from McNally's creation of the infringing Musical Book, as the Musical Book is a necessary component of the performance of the infringing Musical, through which AML has earned and will continue to earn income, *inter alia*, from the sale of tickets.

64.     As a result of McNally's creation of the infringing Musical Book, and AML's vicarious liability therefor, Plaintiffs have been damaged in an amount to be determined at trial.

### PRAYERS FOR RELIEF

WHEREFORE, based upon the foregoing allegations and averments, Plaintiffs respectfully demand that this Court enter judgment in Plaintiffs' favor and against Defendants as follows:

A. Damages in an amount to be determined at trial, with Plaintiffs reserving the right to elect whether to seek actual damages or statutory damages, pursuant to 17 U.S.C. § 504;

B. A permanent injunction enjoining the copying, publication, release, broadcast, performance and other exploitation of the Musical and the related script;

C. An award of the attorney's fees and costs incurred by Plaintiffs in connection with this action, pursuant to 17 U.S.C. § 505.

D. Such other and further relief as this Court deems just and appropriate.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues and claims so triable.

Dated:   September 12, 2017
         New York, New York

| **ROSENBERG & GIGER P.C.** | **MANATT, PHELPS & PHILLIPS, LLP** |
|---|---|
| By: */s/ John J. Rosenberg* <br> John J. Rosenberg <br> Matthew H. Giger <br> 250 Park Avenue, 11th Floor <br> New York, NY 10177 <br> Tel (646) 494-5050 <br> Fax (646) 595-0590 <br><br> *Attorneys for Plaintiff* <br> *Jean-Etienne de Becdelievre* | By: */s/ Robert A. Jacobs* <br> Robert A. Jacobs <br> Prana A. Topper <br> Benjamin J. Wolfert <br> 7 Times Square <br> New York, NY 10036 <br> Tel (212) 790-4500 <br> Fax (212) 790-4545 <br><br> *Attorneys for Plaintiff* <br> *Tams-Witmark Music Library, Inc.* |