Dale M. Cendali
Joshua L. Simmons
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
dale.cendali@kirkland.com
joshua.simmons@kirkland.com

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JEAN-ETIENNE DE BECDELIEVRE and TAMS-WITMARK MUSIC LIBRARY, INC., <br><br> Plaintiffs, <br><br> v. <br><br> ANASTASIA MUSICAL LLC and TERRENCE McNALLY, <br><br> Defendants. | CASE NO. 1:16-cv-09471-AKH <br><br> **ECF CASE** |

**DEFENDANTS' RESPONSE TO**
**PLAINTIFFS' COUNTER-STATEMENT OF ADDITIONAL FACTS**

Pursuant to Federal Rule of Civil Procedure 56 and the Local Rules of the United States District Courts for the Southern District and Eastern District of New York 56.1(b) and (c), Defendants Anastasia Musical LLC and Terrence McNally (collectively, "Defendants") by and through their counsel, respectfully submit the following responses to (1) Plaintiffs Jean Etienne de Becdelievre and Tams-Witmark Music Library, Inc.'s ("Tams-Witmark") (collectively, "Plaintiffs") Responses to Defendants' Statement of Undisputed Facts ("Pls.' RSUF") and (2) "Counter-Statement of Additional Material Disputed Facts" ("Pls.' CSUF").

## DEFENDANTS' RESPONSE TO PLAINTIFFS' RESPONSES TO DEFENDANTS' STATEMENT OF UNDISPUTED FACTS

Defendants alleged ***67 key undisputed facts*** in their Statement of Undisputed Facts in support of their motion for summary judgment ("Defs.' SUF"). It cannot be overemphasized that Plaintiffs do not dispute ***any*** of those 67 facts. Moreover, Plaintiffs offer no evidence contrary to each and every one of Defendants' statements.

In several instances, after stating that a fact was undisputed, Plaintiffs offered additional responses, but their additional responses do not alter the fact that none of Defendants' statements are disputed. Furthermore, Plaintiffs' responses are inconsequential as they are ambiguous, unsupported by evidence, or improper.

***First***, Defendants stated that "[a] certified, direct translation of the French Play into English is attached to the [Declaration of Joshua L. Simmons, Esq. (Dkt. No. 15) ("Simmons Decl.")] as Exhibit C." Defs.' SUF ¶ 9. Plaintiffs ambiguously responded that this fact is "[u]ndisputed insofar as this paragraph of the Statement is construed to describe the document that is reference in said paragraph, as opposed to the substance thereof." Pls.' RSUF ¶ 9. As Defendants' statement did not describe the substance of Exhibit C, Plaintiffs actually agree that the fact is undisputed, and their response merely appears intended to confuse the issues.

*Second*, in some instances, Plaintiffs purported to qualify their responses by stating that they "neither admit nor deny" the facts in Defendants' statements. Defs.' RSUF ¶¶ 29, 32. Plaintiffs, however, failed to offer any evidence disputing Defendants' statements. As Local Rule 56.1(d) clearly states that "[e]ach statement by the . . . opponent. . . controverting any statement of material fact must be followed by citation to evidence," Plaintiffs' responses do not properly dispute the facts asserted therein and the facts are deemed undisputed. *See, e.g., Hoefer v. Bd. of Educ. of Enlarged City Sch. Dist. of Middletown*, No. 10 Civ. 3244, 2013 WL 126238, at *1 n.3 (S.D.N.Y. Jan 9, 2013) (deeming all of the Defendants' assertions supported by evidence admitted where the Plaintiff failed to cite to admissible evidence in opposition); *Costello v. N.Y. State Nurses Ass'n*, 783 F. Supp. 2d 656, 661 n.5 (S.D.N.Y. 2011) (deeming Defendants' assertions admitted where Plaintiff failed to refer to any evidence in the record to support contentions that they were disputed).

*Finally*, while agreeing that Defendants' statements of fact are undisputed, in some instances and without citation or explanation, Plaintiffs state that Defendants' evidence is hearsay.[1] Pls.' RSUF ¶¶ 15–67. This is wrong as a threshold matter because Defendants have introduced these exhibits not to prove whether Ms. Anderson was in fact Anastasia or whether Anastasia survived the assassination, but to show that there have been decades of rumors and public discourse surrounding the myth of her survival. As a result, these documents are not being offered for the ultimate truth of Ms. Anderson's story, and therefore are not hearsay.

---

[1] Pursuant to Your Honor's Individual Rule 2(C)(i)(III), Defendants marked their exhibits with letters and did not duplicate them, such that Exhibits F, G, H, I and J are attached to the Declaration of Joshua L. Simmons, Esq. (Dkt. No. 15). Confusingly and in violation of Your Honor's rules, Plaintiffs improperly labeled different documents Exhibits F, G, H, I and J and attached them to the Declaration of Matthew H. Giger, Esq. (Dkt. No. 52). To be clear, Defendants' statement of undisputed facts cited to Defendants' properly labeled exhibits.

Moreover, even if these documents arguably could be characterized as hearsay, they are admissible for several reasons:

- First, statements in all of the challenged exhibits are admissible under the ancient document rule contained in Federal Rule of Evidence 803(16) as "[a] statement in a document that was prepared before January 1, 1998 and whose authenticity is established."[2] *See George v. Celotex Corp.*, 914 F.2d 26, 30 (2d Cir. 1990) (report that was in existence for more than twenty years and whose authenticity was established was properly admitted as an ancient document pursuant to Rule 803(16)). Under Federal Rule of Evidence 901(a), a document can be considered authentic where the proponent shows that "the item is what the proponent claims it is." *See MMA Consultants 1, Inc. v. Republic of Peru*, 245 F. Supp. 3d 486, 503–04 (S.D.N.Y. 2017) (exhibits were admissible where declaration attaching documents over twenty years of age "provide[d] sufficient information to supplement a finding that these exhibits are 'what the proponent claims'" (citing Fed. R. Evid. 901(a))). Newspaper articles are self-authenticating pursuant to Federal Rule of Evidence 902(6), which states that "[p]rinted material purporting to be a newspaper or periodical" is self-authenticating and "require[s] no extrinsic evidence of authenticity in order to be admitted." *See MMA Consultants 1*, 245 F. Supp. 3d at 503 (excerpts from newspaper articles were self-authenticating). Plaintiffs tacitly admit this straightforward rule as they themselves rely on similar documents to support their counter-statement of additional facts. *See* Pls.' CSUF ¶¶ 1–2 (citing Exhibits. B and F to the Giger Decl., which are newspaper articles written in 1953 and 1954, respectively). In any case, Documents other than newspapers may be authenticated under Federal Rule of Evidence 902(b)(8) where the document "(A) is in a condition that creates no suspicion about its authenticity, (B) was in a place where, if authentic, it would likely be and (C) has been in existence 20 years or more at the time it is offered." *See George*, 914 F.2d at 30 n. 2 (report was determined to be authentic under 902(b)(8)). Thus, Plaintiffs' hearsay objections in Response Nos. 15–67 are improper and should be overruled.

  Of particular note, Plaintiffs object to a 1954 article in the *New York Times* titled "The Riddle of Anastasia," authored by Guy Bolton, whose copyrights Plaintiff Tams-Witmark Music Library, Inc. purports to assert against Defendants in this litigation. Pls.' RSUF ¶ 15 (citing Simmons Decl. Ex. G, at 1). That article is not hearsay for the reasons set forth above. Moreover, Plaintiffs' objection is particularly troubling as Guy Bolton was the author of the English adaptation of Plaintiffs' Play. If any individual was in a position to speak to the historical basis

---

[2] Plaintiffs object to (a) a 1954 article in the *New York Times* titled "The Riddle of Anastasia," authored by Guy Bolton, whose copyrights Plaintiff Tams-Witmark Music Library, Inc. purports to assert against Defendants in this litigation, Pls.' RSUF ¶¶ 15–36; (b) a 1958 article in the *New York Times* titled "Anastasia: Grand Duchess or Grand Hoax?" authored by Arthur J. Olsen, *id.* ¶¶ 45–54; (c) a 1931 book authored by Gleb Botkin, *id.* ¶¶ 37–44; (d) a 1991 book authored by James Blair Lovell titled *Anastasia: The Lost Princess*, *id.* ¶¶ 55–63; and (e) a 1983 book authored by Peter Kurth titled *Anastasia: The Riddle of Anna Anderson*, *id.* ¶¶ 64–67.

      for Plaintiffs' Plays, it would logically be one of its authors.  Faced with Bolton's own admissions of the historical basis for Plaintiffs' works, Plaintiffs are left to grasp at straws to exclude this evidence.  But, as explained herein, Plaintiffs cannot avoid this damaging account as it clearly is admissible evidence.

- Second, to the extent any of the statements that Plaintiffs challenge as hearsay are statements concerning "[a] reputation. . . among [Ms. Anderson's] associates or in the community – concerning [Ms. Anderson's] birth, adoption, legitimacy, ancestry, marriage, divorce, death,. . . or similar facts of personal or family history," they are also admissible under Federal Rule of Evidence 803(19).  *See U.S. v. Jean-Baptise*, 166 F.3d 102, 110 (2d Cir. 1999) (declarant's testimony regarding defendant's location of birth was admissible under 803(19)).

- Finally, all statements in the exhibits challenged by Plaintiffs are admissible under the "residual exception" contained in Federal Rule of Evidence 807, as the statements are trustworthy, offered as evidence of material facts of the historical background of Anna Anderson, are more probative on the point for which they are offered than any other evidence which could be obtained through reasonable efforts, and admitting them would best serve the interests of justice.  *See, e.g., Royal & Sun Alliance Ins. PLC v. UPS Supply Chain Solutions, Inc.*, No. 09 Civ. 5935, 2011 WL 3874878, at *17 (S.D.N.Y. Aug. 31, 2011) (statement was admissible under residual exception where it was not likely to be fabricated, it was material and probative, and best served the interests of justice).  In addition, Plaintiffs have had adequate notice of these statements as they were all included in Defendants' motion to dismiss almost a year ago, and Plaintiffs would not be "unduly surprised" by their admission.  *Id.*  Notably, Plaintiffs offer no evidence or argument opposing the trustworthiness of these documents.

### DEFENDANTS' RESPONSES TO PLAINTIFFS' COUNTER-STATEMENT OF ADDITIONAL FACTS

1.     In or about 1953, the English Play was performed in London at the St. James Theatre, in a production presented by the renowned English actor Sir Lawrence Olivier, receiving positive reviews.  (See Giger Decl. Ex. B.)

**Response**:  **Undisputed, but immaterial**.

2.     In 1954, the English Play enjoyed a successful Broadway run at the Lyceum Theatre, also receiving favorable reviews from theater critics, who described the Plays' climactic "Recognition Scene" as "electrifying" and "exhilarating."  (Id. ¶ 7, Ex. F)

5

**Response:  Undisputed, but immaterial**.  Defendants note that Plaintiffs' Exhibit F confirms that the Play is not a pure work of fiction, but is based on a historical story, as the document itself states that the English Play "is the story of the unhappy woman who appeared out of the mists nearly thirty years ago and whom many people regard as the one surviving royal princess of Old Russia." Giger Decl. Ex. F.

3.  McNally's involvement in the creation of defendants' Musical began 2012 or 2013, when he received a telephone call from his colleagues and creative collaborators, lyricist Lynn Ahrens and composer Stephen Flaherty. (McNally Tr. 22:2-19; Giger Decl., Ex. J.)

**Response:  Undisputed, but immaterial.**

4.  Lynn Ahrens and Stephen Flaherty were the lyricist and composer, respectively, for the 1997 Twentieth Century Fox Film *Anastasia*, which was created under a license from plaintiffs' predecessors.  (Id.)

**Response:  Undisputed, but immaterial**.  Defendants also note that the cited portion of Mr. McNally's transcript does not support the statement that the 1997 Twentieth Century Fox Film *Anastasia* "was created under a license from plaintiffs' predecessors."  Thus, that assertion by Plaintiffs should be disregarded.  *See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) ("[W]here there are no citations or where the cited materials do not support the factual assertions in the Statements, the Court is free to disregard the assertion." (citation, internal brackets, and internal quotation marks omitted)).

5.  Prior to the development of the Musical, McNally collaborated with Ahrens and Flaherty on the Broadway musical *Ragtime*.  (Id. 14:10-15:4.)

**Response:  Undisputed, but immaterial.**

6. Ahrens and Flaherty told defendant McNally that they were "thinking of turning our animated film into a Broadway musical," and they asked McNally to write the book for the contemplated adaptation of the 1997 Fox Film. (Id. 23:11-19.)

**Response**: **Undisputed, but immaterial**. Defendants note for clarification that Mr. McNally testified that Ms. Ahrens and Mr. Flaherty asked him whether he "would be interested in writing the book" for the Musical. Giger Decl. Ex. J, at 23:17–19. Mr. McNally responded that he could "see a stage musical based on their version because of this wonderful score," *id.* at 38:11–13, but he said "if I am going to be involved I want to make it historically accurate." *Id.* at 24:12–14. Mr. McNally told them, "[i]f you want just the movie on stage I am not your guy. I want to make it an original piece by Terrence McNally based on four or five of the wonderful songs in the movie that would remain." Declaration of Joshua L. Simmons, Esq., dated January 22, 2017, ("Simmons 3d Decl.") Ex. AM, at 25:2–7. Defendants further add that Mr. McNally testified that he only watched the 1997 Fox Film once. *Id.* at 30:20–24.

7. McNally rented and viewed both the 1956 and 1997 Fox films (the "Films"), and told his collaborators, Ahrens and Flaherty, that he "can see a stage musical based on their version." (Id. 21:22-24:19, 29:19-24, 38:7-13.)

**Response**: **Undisputed, but immaterial.** Defendants note that Plaintiffs' quotation of Mr. McNally's testimony is misleadingly incomplete. Mr. McNally testified that he could "see a stage musical based on their version ***because of this wonderful score***." Giger Decl. Ex. J, at 38:11–13 (emphasis added). Mr. McNally also said "if I am going to be involved I want to make it historically accurate." *Id.* at 24:12–14. Mr. McNally told Ms. Ahrens and Mr. Flaherty, "[i]f you want just the movie on stage I am not your guy. I want to make it an original piece by Terrence McNally based on four or five of the wonderful songs in the movie that would remain." Simmons 3d Decl. Ex. AM, at 25:2–7. Defendants further add that Mr. McNally testified that he only watched the 1997 Fox Film once. *Id.* at 30:20–24.

7

8.   McNally also viewed the 1956 Fox Film at or about the time that it was initially released in theaters. (Id. 29:6-24.)

**Response**:  **Undisputed, but immaterial.**

9.   McNally told Ahrens and Flaherty that he would want to make two significant changes to the 1997 Film, namely, that "the key song of the show would no longer open the story, and the villain . . . in the film [Rasputin] is not going to appear at all." (Id. 44:3-18.)

**Response**:  **Undisputed** that Mr. McNally told Ms. Ahrens and Mr. Flaherty that "the key song of the show would no longer open the story, and the villain . . . in the film is not going to appear at all, being the figure of Rasputin." Giger Decl. Ex. J, at 44:8-12. Defendants note for clarification, however, Mr. McNally also said "if I am going to be involved I want to make it historically accurate." Id. at 24:12–14. Mr. McNally told them, "[i]f you want just the movie on stage I am not your guy. I want to make it an original piece by Terrence McNally based on four or five of the wonderful songs in the movie that would remain." Simmons 3d Decl. Ex. AM, at 25:2–7. Defendants further add that Mr. McNally testified that he only watched the 1997 Fox Film once. Id. at 30:20–24.

10.   Ahrens and Flaherty agreed to McNally's proposal, and the three of them set out to create a "translation of the animated version [i.e., the 1997 Fox Film] to the Broadway stage" (Id. 79:24-25), which resulted in the defendants' Musical.

**Response**:  **Disputed**. The cited material does not include the quoted text and does not support Plaintiffs' assertion. Thus, the Court should disregard this assertion. *See Holtz*, 258 F.3d at 73. What Defendant McNally testified to was that he could "see a stage musical based on their version because of this wonderful score." Giger Decl. Ex. J, at 38:11–13. Mr. McNally also said "if I am going to be involved I want to make it historically accurate." Id. at 24:12–14.

8

Mr. McNally told Ms. Ahrens and Mr. Flaherty, "[i]f you want just the movie on stage I am not your guy. I want to make it an original piece by Terrence McNally based on four or five of the wonderful songs in the movie that would remain." Simmons 3d Decl. Ex. AM, at 25:2–7. Defendants further add that Mr. McNally testified that he only watched the 1997 Fox Film once. *Id.* at 30:20–24.

11. Both of the Fox Films are based upon plaintiffs' Plays. (Giger Decl. ¶¶ 8, 12, 14, 16-18, 20-23 & Exs. G, K, M, O-Q, S-V.)

**Response: Undisputed** that Exhibit G contains the words "based upon." Defendants, however, note that Exhibits K, M, O, P, Q, S, T, U, and V do not support Plaintiffs' assertion. Further, these documents only serve to prove that the Play was based on a historical story. As Exhibit G states, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Giger Decl. Ex. G, at 11–12 (emphasis added). Defendants further note that in what purports to be "Exhibit A" in Exhibit G, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Additionally, ▮▮▮▮▮▮▮▮▮▮ *Id.*, at 22–23. Defendants also note that, as even Plaintiffs' own documents recognize, the films were different from the Play, which "ha[d] gained pictorial scope and emotional dimensions in reaching the cinematic form [in the 1956 Film]. For Mr. Laurents has wisely given it geographical range, added strong scenes that the play barely

9

suggested and expanded the conflicts within the heroine. Anatole Litvak has smartly staged [the film] for a fine projection of its human ironies." Giger Decl. Ex. A. Plaintiffs cannot claim copyright in these elements as they are original to the Films. *See* Defendants' Memorandum of Law in Support of Motion for Summary Judgment (Dkt. No. 42) ("Defs.' Br.") at 4.

12. The Fox Films were created under a license from Marcelle Maurette and Guy Bolton, plaintiffs' predecessors, to use the Plays in the creation of theatrical films. (Id. Ex. E, G.)

**Response: Undisputed, but immaterial**. This fact is immaterial because, as explained by Defendants in their opening brief, the films are not relevant to the question of whether Defendants' Musical is substantially similar to Plaintiffs' Play. *See* Defs.' Br. 8 n.5. Defendants note for clarification that Exhibit E states that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Giger Decl. Ex. E, at 1 (emphasis added). Defendants also note that, as even Plaintiffs' own documents recognize, the films were different from the Play, which "ha[d] gained pictorial scope and emotional dimensions in reaching the cinematic form [in the 1956 Film]. For Mr. Laurents has wisely given it geographical range, added strong scenes that the play barely suggested and expanded the conflicts within the heroine. Anatole Litvak has smartly staged [the film] for a fine projection of its human ironies." Giger Decl. Ex. A. Plaintiffs cannot claim copyright in these elements as they are original to the Films. *See* Defs.' Br. 4.

13. The licenses for the Fox Films ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Id. Ex. G, at 11.)

**Response: Undisputed but immaterial** that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Giger Decl. Ex. G, at 11.

10

This fact is immaterial because, as explained by Defendants in their opening brief, the films are not relevant to the question of whether Defendants' Musical is substantially similar to Plaintiffs' Play. *See* Defs.' Br. 8 n.5. Defendants note that this fact is further immaterial because it is Defendants' position that no license was necessary, as Defendants' Musical is not substantially similar to Plaintiffs' Play. *See*, *e.g.*, Defs.' Br. Defendants also note that, as even Plaintiffs' own documents recognize, the films were different from the Play, which "ha[d] gained pictorial scope and emotional dimensions in reaching the cinematic form [in the 1956 Film]. For Mr. Laurents has wisely given it geographical range, added strong scenes that the play barely suggested and expanded the conflicts within the heroine. Anatole Litvak has smartly staged [the film] for a fine projection of its human ironies." Giger Decl. Ex. A. Plaintiffs cannot claim copyright in these elements as they are original to the Films. *See* Defs.' Br. 4.

14. The following are excerpts of screen shots from the credits to the 1956 Film and the 1997 Film, respectively:





(Giger Decl. ¶ 25.)

11

**Response:  Undisputed, but immaterial.**  Defendants object to the purported screen shots in Paragraph 14 as they are unauthenticated and therefore inadmissible.  *See Affiliated Records Inc. v. Taylor*, No. 09 Civ. 9938, 2012 WL 1675589, at *4 (S.D.N.Y. May 14, 2012) (unauthenticated screen shots were not competent evidence to create a triable issue of fact).  This fact is immaterial because, as explained by Defendants in their opening brief, the films are not relevant to the question of whether Defendants' Musical is substantially similar to Plaintiffs' Play.  *See* Defs.' Br. 8 n.5.  Rather, the operative comparison is the Plaintiffs' works and the allegedly infringing Musical.  *Id.*  Defendants also note that, as even Plaintiffs' own documents recognize, the films were different from the Play, which "ha[d] gained pictorial scope and emotional dimensions in reaching the cinematic form [in the 1956 Film].  For Mr. Laurents has wisely given it geographical range, added strong scenes that the play barely suggested and expanded the conflicts within the heroine.  Anatole Litvak has smartly staged [the film] for a fine projection of its human ironies."  Giger Decl. Ex. A.  Plaintiffs cannot claim copyright in these elements as they are original to the Films.  *See* Defs.' Br. 4.

15.   The cover for the script of the Musical identifies it as "Inspired by the Twentieth Century Fox Motion Pictures," *i.e.*, the 1956 and 1997 Fox Films.  (Id. Ex. K.)

**Response:  Undisputed but immaterial** that the first page of the script of the Musical includes the quoted language.  This fact is immaterial because, as explained by Defendants in their opening brief, the films are not relevant to the question of whether Plaintiffs' Play is substantially similar to Defendants' Musical.  *See* Defs.' Br. 8 n.5.  Rather, the operative comparison is the Plaintiffs' works and the allegedly infringing Musical.  *Id.*  Defendants note for clarity that Mr. McNally testified that "Inspired is a very vague word."  Simmons 3d Decl. Ex. AM, at 84:9.  Defendants further note that as Mr. McNally testified, "the movie was not a

guideline to writing the libretto." Giger Decl. Ex. J, at 20:4–5.  Mr. McNally also said "if I am going to be involved I want to make it historically accurate." *Id.* at 24:12–14.  Mr. McNally told Ms. Ahrens and Mr. Flaherty, "[i]f you want just the movie on stage I am not your guy.  I want to make it an original piece by Terrence McNally based on four or five of the wonderful songs in the movie that would remain."  Simmons 3d Decl. Ex. AM, at 25:2–7.  Defendants further add that Mr. McNally testified that he only watched the 1997 Fox Film once.  *Id.* at 30:20–24.  Defendants also note that, as even Plaintiffs' own documents recognize, the films were different from the Play, which "ha[d] gained pictorial scope and emotional dimensions in reaching the cinematic form [in the 1956 Film].  For Mr. Laurents has wisely given it geographical range, added strong scenes that the play barely suggested and expanded the conflicts within the heroine.  Anatole Litvak has smartly staged [the film] for a fine projection of its human ironies."  Giger Decl. Ex. A.  Plaintiffs cannot claim copyright in these elements as they are original to the Films.  *See* Defs.' Br. 4.

16.     The Musical has been advertised and promoted as "based upon" and "inspired by" both the 1956 and 1997 Fox Films.  (See Id. Ex. T, U.)

**Response:  Undisputed, but immaterial.**  This fact is immaterial because, as explained by Defendants in their opening brief, the films are not relevant to the question of whether Defendants' Musical is substantially similar to Plaintiffs' Play.  *See* Defs.' Br. 8 n.5.  Defendants also note that Mr. McNally explained that he could "see a stage musical based on [the animated] version *because of this wonderful score*."  Giger Decl. Ex. J, at 38:11–13 (emphasis added).  Mr. McNally also said "if I am going to be involved I want to make it historically accurate." *Id.* at 24:12–14.  Mr. McNally told Ms. Ahrens and Mr. Flaherty, "[i]f you want just the movie on stage I am not your guy.  I want to make it an original piece by Terrence McNally based on four

or five of the wonderful songs in the movie that would remain." Simmons 3d Decl. Ex. AM, at 25:2–7. Defendants further add that Mr. McNally testified that he only watched the 1997 Fox Film once. *Id.* at 30:20–24. Defendants also note that, as even Plaintiffs' own documents recognize, the films were different from the Play, which "ha[d] gained pictorial scope and emotional dimensions in reaching the cinematic form [in the 1956 Film]. For Mr. Laurents has wisely given it geographical range, added strong scenes that the play barely suggested and expanded the conflicts within the heroine. Anatole Litvak has smartly staged [the film] for a fine projection of its human ironies." Giger Decl. Ex. A. Plaintiffs cannot claim copyright in these elements as they are original to the Films. *See* Defs.' Br. 4.

Defendants further note that Ms. Ahrens states in Exhibit U that "it might be interesting to provide info on Anna Anderson, and other such 'pretenders,'--how the myth of Anastasia came to be, the tale of the DNA trail, the missing bones, their final resting places, etc. These are questions that come up repeatedly. . . And I think it's fascinating to think that even though we know the truth today, the myth continues on." Giger Decl. Ex. U.

17.     The Musical was created under a license from Twentieth Century Fox ▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (the "Fox License"). (Id. Ex. N, at ANASTASIA0031123-31124.)

**Response**: **Undisputed, but immaterial.** This fact is immaterial because, as explained by Defendants in their opening brief, the films are not relevant to the question of whether Defendants' Musical is substantially similar to Plaintiffs' Play. *See* Defs.' Br. 8 n.5. Defendants note for clarity that Mr. McNally testified that, in referring to the 1997 Fox Film, "there is a germ of an idea here in these four or five terrific songs that I think audiences will enjoy hearing again sung by real people as opposed to being sung by a drawing of a young girl cartoon." Giger Decl. Ex. J, at 38:19–24. Defendants further note that pursuant to Exhibit N, ▓▓▓▓▓

14

███ Defendants also note that, as even Plaintiffs' own documents recognize, the films were different from the Play, which "ha[d] gained pictorial scope and emotional dimensions in reaching the cinematic form [in the 1956 Film]. For Mr. Laurents has wisely given it geographical range, added strong scenes that the play barely suggested and expanded the conflicts within the heroine. Anatole Litvak has smartly staged [the film] for a fine projection of its human ironies." Giger Decl. Ex. A. Plaintiffs cannot claim copyright in these elements as they are original to the Films. See Defs.' Br. 4.

18. The Fox License ███████. (Id.)

**Response: Undisputed, but immaterial.** This fact is immaterial because, as explained by Defendants in their opening brief, the films are not relevant to the question of whether Defendants' Musical is substantially similar to Plaintiffs' Play. See Defs.' Br. 8 n.5. Defendants also note that, as even Plaintiffs' own documents recognize, the films were different from the Play, which "ha[d] gained pictorial scope and emotional dimensions in reaching the cinematic form [in the 1956 Film]. For Mr. Laurents has wisely given it geographical range, added strong scenes that the play barely suggested and expanded the conflicts within the heroine. Anatole Litvak has smartly staged [the film] for a fine projection of its human ironies." Giger Decl. Ex. A. Plaintiffs cannot claim copyright in these elements as they are original to the Films. See Defs.' Br. 4.

19. In the Fox License, Fox ███████ (Id. at ANASTASIA0031123.)

**Response: Undisputed, but immaterial.** This fact is immaterial because, as explained by Defendants in their opening brief, the films are not relevant to the question of whether Defendants' Musical is substantially similar to Plaintiffs' Play. *See* Defs.' Br. 8 n.5. Defendants also note that, as even Plaintiffs' own documents recognize, the films were different from the Play, which "ha[d] gained pictorial scope and emotional dimensions in reaching the cinematic form [in the 1956 Film]. For Mr. Laurents has wisely given it geographical range, added strong scenes that the play barely suggested and expanded the conflicts within the heroine. Anatole Litvak has smartly staged [the film] for a fine projection of its human ironies." Giger Decl. Ex. A. Plaintiffs cannot claim copyright in these elements as they are original to the Films. *See* Defs.' Br. 4.

20.     The Fox License states, ███████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████
███████████████████████ (Id.)

**Response: Undisputed but immaterial** that the cited document contains the quoted language. This fact is immaterial because, as explained by Defendants in their opening brief, the films are not relevant to the question of whether Defendants' Musical is substantially similar to Plaintiffs' Play. *See* Defs.' Br. 8 n.5. Defendants also note that, as even Plaintiffs' own documents recognize, the films were different from the Play, which "ha[d] gained pictorial scope and emotional dimensions in reaching the cinematic form [in the 1956 Film]. For Mr. Laurents has wisely given it geographical range, added strong scenes that the play barely suggested and expanded the conflicts within the heroine. Anatole Litvak has smartly staged [the film] for a fine projection of its human ironies." Giger Decl. Ex. A. Plaintiffs cannot claim copyright in these elements as they are original to the Films. *See* Defs.' Br. 4.

16

21.  Under the Fox License, ███████████████████████████████████████████ (Id. at ANASTASIA0031126.)

**Response: Undisputed but immaterial** that the cited document states that ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Giger Decl. Ex. N, at ANASTASIA0031126.  Defendants note that, to avoid needless litigation, Anastasia Musical initiated negotiations with Plaintiffs related to the Play, during which Anastasia Musical informed Plaintiffs no license was necessary as the Musical was not based on the Play, and that no agreement between the parties was reached.  Furthermore, during those negotiations, Defendants were consistently clear to Plaintiffs that the works were not substantially similar and therefore no license was necessary.  In any case, this fact is immaterial because, as explained by Defendants in their opening brief, the films are not relevant to the question of whether Plaintiffs' Play is substantially similar to Defendants' Musical.  *See* Defs.' Br. 8 n.5.

22.  McNally's co-creators, Ahrens and Flaherty, acknowledged in an interview published on the Internet by *American Theatre* magazine that the Musical is based upon both the 1956 and 1997 Fox Films.  (Id. Ex. V.)

**Response: Undisputed, but immaterial.**  This fact is immaterial because, as explained by Defendants in their opening brief, the films are not relevant to the question of whether Defendants' Musical is substantially similar to Plaintiffs' Play.  *See* Defs.' Br. 8 n.5.  Defendants note that Mr. Flaherty and Ms. Ahrens do not say the Musical is "based upon" the 1956 and 1997 Fox Films, and this allegation should be disregarded.  *See Holtz*, 258 F.3d at 73 ("[W]here there are no citations or where the cited materials do not support the factual assertions in the

17

Statements, the Court is free to disregard the assertion." (citation, internal brackets, and internal quotation marks omitted)). Instead, Defendants note for clarity that Mr. Flaherty actually states in Exhibit V that "When we did the film for Fox it was intended to be a family-audience animated film, and we were only allowed at that point to go so deep into the subject matter. We feel really fortunate that now that we're adapting and actually creating what is essentially a *brand-new* musical for the stage, we can go much deeper in terms of the history and the music while keeping some of the songs from the film. We are keeping five tunes, including 'Journey to the Past,' which was nominated for an Oscar. We are creating more than 20 new musical cues, songs, and sequences. *It really is a new musical.*" Giger Decl. Ex. V, at 2 (emphasis added).

23.    In the *American Theatre* interview, Ahrens described the origin of defendants' Musical as follows: "Over the years, as other movie companies began to exploit their movie titles for stage musicals, Fox decided, 'Oh, we have all these great movies, we should do that to [*sic*].' First and foremost was *Anastasia*." (Id.)

**Response: Undisputed, but immaterial.** Defendants object to Exhibit V as inadmissible hearsay because Ms. Ahrens did not make this statement while testifying, and Plaintiffs offer this evidence to prove the origin of Defendants' Musical. *See* Fed. R. Evid. 801, 802. In any case, this fact is immaterial because, as explained by Defendants in their opening brief, the films are not relevant to the question of whether Defendants' Musical is substantially similar to Plaintiffs' Play. *See* Defs.' Br. 8 n.5. Defendants also note that, as even Plaintiffs' own documents recognize, the films were different from the Play, which "ha[d] gained pictorial scope and emotional dimensions in reaching the cinematic form [in the 1956 Film]. For Mr. Laurents has wisely given it geographical range, added strong scenes that the play barely suggested and expanded the conflicts within the heroine. Anatole Litvak has smartly staged [the

film] for a fine projection of its human ironies." Giger Decl. Ex. A.  Plaintiffs cannot claim copyright in these elements as they are original to the Films. *See* Defs.' Br. 4.

24.    Defendants' prior counsel contacted representatives of plaintiffs regarding a possible license to use the Plays in the creation of their Musical, and engaged in negotiations toward that end, but the parties failed to reach agreement.  (O'Donnell Decl. ¶¶ 3-4.)

**Response**:  **Undisputed, but immaterial.**  Defendants note that, to avoid needless litigation, Anastasia Musical initiated negotiations with Plaintiffs related to the Play, during which Anastasia Musical informed Plaintiffs no license was necessary as the Musical was not based on the Play, and that no agreement between the parties was reached.  Furthermore, during those negotiations, Defendants were consistently clear to Plaintiffs that the works were not substantially similar and therefore no license was necessary.

25.    Defendants have not obtained any license or other rights to use the Plays in the creation of the Musical.  (Id. ¶ 5.)

**Response**:  **Undisputed, but immaterial.**  Defendants note that, to avoid needless litigation, Anastasia Musical initiated negotiations with Plaintiffs related to the Play, during which Anastasia Musical informed Plaintiffs no license was necessary as the Musical was not based on the Play, and that no agreement between the parties was reached.  Furthermore, during those negotiations, Defendants were consistently clear to Plaintiffs that the works were not substantially similar and therefore no license was necessary.

26.    Defendants proceeded with the creation and presentation of the Musical with full knowledge of the Plays and despite their failure to obtain a license or any rights in the Plays from plaintiffs.  (Id. ¶ 5; Giger Decl. Ex. N.)

**Response: Undisputed, but immaterial.** As indicated above, Defendants did not believe that any license was necessary as the Musical was not substantially similar to the Play, and repeatedly informed Plaintiffs of that fact during negotiations.

Respectfully submitted,

Dated: New York, New York
January 22, 2018

*/s/ Dale Cendali*

Dale M. Cendali
Joshua L. Simmons
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446 4800
dale.cendali@kirkland.com
joshua.simmons@kirkland.com

*Attorneys for Defendants*