UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- X

JEAN-ETIENNE DE BECDELIEVRE and TAMS- :
WITMARK MUSIC LIBRARY, INC.,

Plaintiffs,

-against-

ANASTASIA MUSICAL LLC and TERRENCE
McNALLY,

Defendants.

------------------------------------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 4/2/2018

**OPINION AND ORDER
DENYING SUMMARY
JUDGMENT**

16 Civ. 9471 (AKH)

ALVIN K. HELLERSTEIN, U.S.D.J.:

   This case concerns a copyright dispute involving Anastasia, the classic Russian

tale adapted into a play, film, and now a musical. While the original story is drawn from a

skeleton of historical facts, Plaintiffs Jean-Etienne de Becdelievre and Tams-Witmark Music

Library, Inc. ("Plaintiffs") hold the copyright to the fictionalized play (the "Play") written in the

1940s by Marcelle Maurette, a French playwright, and adapted to English in 1952 by Guy

Bolton. Recently, defendant Terrance McNally wrote a musical version of the story (the

"Musical"), also entitled Anastasia, that premiered on Broadway in April of 2017. Defendants

McNally and Anastasia Musical LLC ("Defendants") now move for summary judgment, arguing

that the two works—the Play and Musical—are not substantially similar. For the reasons

discussed herein, defendants' motion for summary judgment is denied.

## Background

### A.    Procedural History

This case presents a relatively simple copyright dispute, but one that is complicated by a lengthy historical record. Jean-Etienne de Becdelievre is the sole owner of the copyright interests held by Marcelle Maurette, the French author and playwright who authored the original Anastasia play; Tams Witmark is the successor-in-interest to Guy Bolton, who adapted the French version of the Play to English. Together, they filed this claim for copyright infringement on December 8, 2016.[1]

On January 23, 2017, defendants filed a motion to dismiss to complaint, largely on the same basis as the instant motion. *See* Memorandum of Law, ECF 14. On January 24, the next day, I entered an order denying the motion to dismiss, holding as follows:

> Defendants' motion asks me to dismiss a claim for copyright infringement by comparing the copyrighted work to facts that are alleged to be historical, to another play based on the same facts, and to a current work that is said to be infringed. Defendants' motion, filed pursuant to Rule 12(b)(6), asks me to make this comparison before Answers are filed, and without guidance by experts. I am unable to make such a complicated comparison. In order to do so, I would need to take judicial notice of facts said to be historical -- an inappropriate exercise. I would also have to analyze similarities and differences among different literary expressions. The complaint is well-pleaded, and not dismissable on motion. A Rule 12(b)(6) motion is inappropriate, and is denied.

Order, ECF 16

On April 4, 2017, following a status conference, I ordered that the case would proceed into discovery, "limited solely to the issue of how the allegedly infringing work was created." Procedural Order, ECF 20, at 1. The parties did so, principally by taking the

---

[1] By stipulation, plaintiffs filed an amended complaint on September 19, 2017 to add Tams-Witmark as a party.

deposition of McNally, the author and playwright of the non-musical portions of the Musical.
*See* Declaration of Dale M. Cendali, ECF 39, Ex. N.

In the Procedural Order, I also instructed plaintiffs to submit an annotated version
of the Musical's script, along with a memorandum identifying "what in plaintiff's work is being
infringed." Procedural Order, ECF 20, at 1. Plaintiffs did so on September 19, 2017, *see*
Submission, ECF 30, Ex. 1 (hereinafter "Plaintiffs' Submission"), highlighting various elements
of the plot, characters, specific scenes, themes, and sections of dialog that they claim were
appropriated from the Play.

In response to plaintiffs' Submission, defendants filed the instant motion for
summary judgment on November 21, 2017, again claiming that the Play and Musical are not
substantially similar.

## B.    Licensing History

This dispute is best understood against the backdrop of licensing agreements
dating back to the Play's creation. Although this history does not directly answer the question at
issue in this motion—whether the two works are substantially similar—the creative lineage of
the two works helps to place this dispute in context.

As noted above, the French version of the Play was written by Marcelle Maurette,
and was later registered with the U.S. copyright office in 1948. *See* Declaration of Matthew H.
Giger, ECF 52, Ex. E, at ¶ B. The Play was later translated into English by Guy Bolton in the
early 1950s, and the English version of the Play was registered for U.S. copyright protection in
1952. *See* Declaration of Matthew H. Giger, ECF 52, Ex. E, at ¶ D.[2]  In 1955, Maurette and
Bolton entered into a licensing agreement with Twentieth-Century Fox Studios ("Fox"), granting

---

[2] The English version of the Play was performed in London in 1953 and on Broadway at the Lyceum Theatre in
1954. *See* Declaration of Matthew H. Giger, ECF 52, Ex. B, F.

3

Fox the creative rights to develop a film version of the Play ("Film License"). *See* Declaration of Matthew H. Giger, ECF 52, Ex. G. While the Film License allowed Fox to develop motion picture adaptations of the Play, it explicitly reserved any "rights to the production on the spoken stage," which were retained by Maurette and Bolton. *See* Declaration of Matthew H. Giger, ECF 52, Ex. G, at 11.

Consistent with the terms of the Film License, Fox developed and released a film entitled "Anastasia" in 1956, garnering an Academy Award for Ingrid Bergman, the actress who played the Anna/Anastasia character. Based on the success of the first film, Fox exercised an option to extend the "Motion Picture Rights" to the Play in 1963, and did so again in 1993, incorporating by reference the agreement that Maurette and Bolton retained the stage rights to the Play. *See* Declaration of Matthew H. Giger, ECF 52, Ex. E. Based on the 1993 extension, Fox developed an animated version of "Anastasia," which was released in 1997. Finally, the ice skating production "Anastasia on Ice" was performed throughout the United States in 1998 and 1999, for which plaintiffs granted Fox a retroactive license. *See* Declaration of Matthew H. Giger, ECF 52, Ex. H. The retroactive license, granted as part of a settlement agreement, again confirmed that plaintiffs retained "all rights to present productions of the Play . . . upon the spoken stage." *Id.* at ¶ B.

The record shows that McNally and his partners were aware of this licensing history when they began developing the Musical.[3] Before production began, McNally and his partners obtained a license from Fox to use the creative elements of the Films in the Musical adaptation ("Musical License"). *See* Declaration of Matthew H. Giger, ECF 52, Ex. N. But the Musical License, to which plaintiffs were not a party, specifically excluded stage rights to the

---

[3] McNally testified at his deposition that his original task was to create a musical adaptation of the 1997 animated film. *See* Declaration of Matthew H. Giger, ECF 52, Ex. J, at 81:24–25 (calling the Musical "our translation of the animated version to the Broadway stage"); *see also id.* at 37:24–38:13. He also testified that he read the Play for the first time the weekend before his deposition. *See* Declaration of Dale M. Cendali, ECF 39, Ex. N, at 63:9–13.

4

Play, which were still held by the successors-in-interest to Maurette and Bolton. *See* Declaration

of Matthew H. Giger, ECF 52, Ex. N, at ¶ 1(b) ("The warranties and representations made herein

by Owner apply only to the original literary material (and, with respect to the Fox Songs, music

and lyrics) contained in the Property and do not relate to any other elements comprising the

Properly, including, without limitation, the Maurette/Bolton Play . . . ."). In fact, the Musical

License imposed on the Musical's production company the obligation "to use all reasonable

efforts to secure live stage dramatico-musical rights in the Maurette/Bolton Play." *Id.* at ¶ 2(i).

It appears that the parties attempted to negotiate such a license, but were unable to reach an

agreement. *See* Declaration of Timothy O'Donnell, ECF 53, at ¶¶ 3–5.

## C.   **Historical Record**

As explained in greater detail below, defendants' motion requires the Court to

consider whether the two works are substantially similar, extracting from the analysis any non-

copyrightable historical facts. This section sets out those historical facts, as presented by

defendants through exhibits and appendices summarizing the historical record.

The Grand Duchess Anastasia Romanov, daughter of the Russian Tsar Nicholas

II, was born in 1901. In 1918, in the wave of the communist revolution, the Tsar, his wife, and

their children were killed by revolutionaries. After the Tsar's family was supposedly killed in

Russia, rumors began to surface that Anastasia, the Tsar's youngest daughter, had survived the

assassination attempt and fled to Europe. In part because the Tsar had a small fortune stashed

away in foreign banks, a number of women came forward during this time claiming to be

Anastasia. Members of the Romanov family, who at this time were living in exile in Western

Europe, apparently met with some of these women, ultimately denouncing all of them as frauds.

Perhaps the most famous woman who claimed Anastasia's royal title was Anna

Anderson, whose story inspired Maurette to write the original version Play. Some, including

5

Guy Bolton, the English author of the translated play, genuinely believed that Anastasia, now known as Anna Anderson, escaped the revolutionaries with the help of two brothers and members of the Royal guard, using "jewels sewn in her clothes to support them" on their journey to the West. *See* Declaration of Joshua L. Simmons, ECF 44, Ex. G.[4]  By all accounts, the real Anna Anderson suffered from severe psychological issues, including amnesia, and was eventually committed to the Dalldorf Asylum in Berlin after she attempted to commit suicide by throwing herself into Berlin's Landwehr Canal. According to the rumors, it was at the asylum that she supposedly told one of the nuns that she was actually Anastasia Romanov, daughter of Tsar Nicholas II.

Up to this point, the historical record appears fairly clear, and the parties do not dispute the basic contours of Anna Anderson's story. What happened next is somewhat less clear. It appears that Anna Anderson spent a number of years attempting to convince the public and members of the royal family of her parentage.[5]  Some documents suggest that Anna Anderson met with certain members of the exiled royal family during this period, including Anastasia's aunt, the Grand Duchess Olga, and Princess Irene. *See* Memorandum of Law, ECF 42, at A24–25. Upon meeting Anna Anderson, Princess Irene apparently tested her with a series of questions about her past and although their meeting was not public, Princess Irene emerged believing that Anna Anderson was not Anastasia. The family eventually declared that "not a

---

[4] As discussed in greater detail blow, whether Anna Anderson was *in fact* Anastasia is beside the point. The critical question is whether the rumors surrounding Anna Anderson existed at the time the Play was written. Put differently, the existence of the rumors themselves is the historical fact that counts, not whether such rumors were actually true.
[5] Defendants also claim that Anna Anderson made contact with Baron Arthur von Kleist, a German man who was familiar with members of the exiled Russian royal family. *See* Declaration of Joshua L. Simmons, ECF 44, Ex. I. Von Kleist was apparently later revealed as a swindler whose true motivation was to obtain a portion of the Romanov fortune, *see id.*, and defendants suggest that his story creates a historical precedent for analogous characters in the Play and Musical, namely Bounine and Vlad. The Court's denial of defendants' motion does not hinge on plaintiffs' claim that Vlad is an adaptation of the Play's Bounine character. This question merely presents another question of fact that is not ripe for resolution on summary judgment.

single member of [the Tsar's] family is still alive," effectively ending the family's official search for Anastasia. *See* Declaration of Joshua L. Simmons, ECF 44, Ex. H. Although Anna Anderson's story was not ultimately accepted by the royal family, her knowledge of Anastasia's past and her ability to convince many that her claims were genuine is a common thread that ties much of the historical record together.

As part of her quest to gain recognition, there is some indication that Anna Anderson wanted to meet the Dowager Empress Maria Fyodorovna, Anastasia's grandmother, who was living in exile in Western Europe at the time. But, crucially, there is no indication that such a meeting ever took place, apparently because the Dowager Empress was quite old at this point. *Id.* at A25.[6] This point is particularly important, for both the Play and Musical depict a scene in which the main character meets the Dowager Empress and, in an emotionally resonant moment, convinces her that she is, in fact, Anastasia.

## D.     Summary of the Play and Musical

Both the Play and the Musical borrow elements of the story of Anna Anderson, using it as a skeleton to build out a fictional tale. The plots of each are described below.

### 1.     The Play

The Play is a dramatic tale told in three acts that fictionalizes certain elements of Anna Anderson's life. Set in Berlin, the Play opens with three conspirators—Bounine, Chernov, and Petrovin—discussing their fraudulent scheme to convince Swedish bankers to give them access to Tsar Nicholas II's foreign bank accounts, in which he had apparently placed a considerable fortune. With their scheme apparently unraveling, Bounine, the leader of the group,

---

[6] Gleb Botkin, who apparently knew Anastasia as a child, met Anna Anderson and became convinced that her claims were true. In his book, Botkin wrote that Anna Anderson's "chief desire was to see her grandmother, the Dowager-Empress, but this appeared to be no longer probable, as the Empress could not be expected to live much longer." Declaration of Joshua L. Simmons, ECF 44, Ex. F, at 289.

7

introduces the others (and the audience) to Anna Bronin, a young woman who had previously told a nun at a Dausdorf mental hospital that she was actually Anastasia Romanov. Anna, who suffers from amnesia, now claims that she fabricated the story. Undeterred, the three conspirators enlist Anna into their scheme (in one instance, under the threat of violence), and promise to teach her the Romanov family's history and how to behave like royalty. Reluctantly, she agrees.

Weeks have passed when Act Two begins. It is apparent that during the intervening period, the three conspirators have tutored Anna almost around the clock. She can now effectively "pass" as Anastasia by "remembering" intimate details about her past life and maintaining an air of class and sophistication that surprises even Bounine, Chernov, and Petrovin. Anna even convinces Russian exiles and certain secondary and tertiary members of the royal family. It is at this point that Petrovin even begins to question whether Anna actually *is* Anastasia.[7] Later in Act Two, Anna is confronted with Michael Serensky, who claims that Anna Brolin is actually Anya, a woman he claims to have known from their time together in a hospital in Bucharest. (Serensky's story, which is later published in a local newspaper, contributes to the dramatic tension in the climax of the Play.) Finally, Act Two concludes with the long-awaited meeting between Anna and the Dowager Empress, Anastasia's grandmother. Hardened by the loss of her family, the Empress is initially suspicious of Anna and refuses to believe her story. But in a dramatic scene in which Anna "recalls" intimate details between them from Anastasia's childhood, the Empress recognizes Anna as Anastasia, marking a crucial turning point in the story.

---

[7] Defendants claim in their papers that "[a]t no point do the conspirators or Anna believe that Anna is Anastasia." Memorandum of Law, ECF 42, at 2. This is demonstrably false. In Act Two, Petrovin specifically states "it seems to me at times that it passes the extraordinary and becomes the uncanny." Declaration of Joshua L. Simmons, ECF 44, Ex. A. at 40. When pressed, he asks Bounin, "Are you sure Anastasia was killed?" *Id.* Indeed, Anna herself sometimes believes that she is actually Anastasia. In Act Three, as Anna recalls intimate details about Anastasia's childhood, she asks, "Was it I? If not, how did I learn it? It was not from your books." *Id.* at 74.

8

Two weeks having passed, Act Three begins on the night that Anna is to be presented to the world as Anastasia. The conspirators are seen organizing the event, hoping that their presentation of Anna, and the Empress's recognition of her, will convince the Swedish bankers to give Anna—and, by extension, themselves—access to the Tsar's fortune. When the Empress arrives, however, she confronts Bounine and accuses him of fraud. Apparently the Empress has spent time with Anna off-stage in the intervening weeks and is now convinced that she is not Anastasia after all. Undeterred, Bounine pleads with the Empress to go along with the presentation in spite of her doubts to allow her nephew, Paul, to marry Anna and let both of them share in the Tsar's fortune. As the Empress waivers, Anna also harbors doubts and confronts Paul about whether he would still want to marry her without the fortune that awaits them. As tension builds, the climax of the show is the final meeting between Anna and the Empress. Anna tells her that she cares not for the money or title—she wants only her grandmother's recognition and affection. The Empress, who has lost the hardened and cold demeanor that she had when the audience first met her, is now portrayed as a loving and maternal figure for Anna. When the two part, it is not clear whether Anna will go along with the presentation ceremony. But just as the ceremony begins, Anna slips away offstage—she has decided not to accept the Tsar's fortune after all. Asked why, the Empress explains that Anna has left "[t]o find life—her real life." Declaration of Joshua L. Simmons, ECF 44, Ex. A. at 40.

2.      The Musical

While different in certain ways, the Musical contains a number of similarities to the Play. Some of the similarities can be traced to the historical record outlined above. But others cannot, and the similarities require the Court to deny defendants' motion.

In contrast to the Play, the Musical is a more comical, musically oriented show with over two dozen scenes. The Musical opens with a touching scene between five-year-old Anya, the analog to the "Anna" character in the Play, and the Dowager Empress, her

9

grandmother, as they sing a song together played over the tune from a music box. After a brief interlude to the revolutionary period, the Musical beings its story in earnest in 1927 St. Petersburg, after the revolution, where Anya is working as a street sweeper. Seeking passage to France, she meets Dmitry and Vlad, who are looking for an actress to pass for Anastasia and help them collect a portion of the Tsar's fortune. Anya's companions begin tutoring her on Anastasia's family history and how to behave like royalty, and over time they come to believe that Anya might be the true Anastasia. As Soviet police begin to close in on the group, attempting to eliminate any remaining members of the royal family, Anya and her companions attempt to flee by train from St. Petersburg to Paris. It is during this period that Anya and Dmitry begin to fall in love.

After the three companions escape from the train, they arrive in Paris and begin the process of trying to introduce Anya to exiled members of the royal family. The Dowager Empress is presented, and is portrayed as a caring but hardened woman who initially refuses to meet with Anya, calling her an "imposter." Declaration of Joshua L. Simmons, ECF 44, Ex. D. at 106. After Dmitry partially persuades the Empress, she agrees to meet Anya, leading to an emotionally resonant scene involving the same music box from the show's opening. The Empress recognizes Anya as Anastasia, much as she did in the Play, but just as she is to be presented to the world as the long-lost Anastasia, Anya begins to have doubts. With the assurance from her grandmother that they will always have each other, Anya decides to forego a royal life and return to Dmitry to lead a simple life with him, out of the public view. The Musical ends happily with Anya finding Dmitry on the Alexander Bridge, named for Anastasia's grandfather, and they walk off together as the curtain falls.

## Discussion

Under the well-established summary judgment standard, a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact

10

and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In ruling on a motion for summary judgment, a Court must "view the evidence in the light most favorable to the party opposing summary judgment, . . . draw all reasonable inferences in favor of that party, and . . . eschew credibility assessments." *Amnesty Am. v. Town of West Hartford,* 361 F.3d 113, 122 (2d Cir. 2004).

## A.    Legal Standard for Copyright Infringement

"In order to establish a claim of copyright infringement, 'a plaintiff with a valid copyright must demonstrate that: (1) the defendant has actually copied the plaintiff's work; and (2) the copying is illegal because a substantial similarity exists between the defendant's work and the protectible elements of plaintiff's.'" *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 63 (2d Cir. 2010) (quoting *Hamil Am. Inc. v. GFI*, 193 F.3d 92, 99 (2d Cir. 1999)). There is no dispute that plaintiffs hold a valid copyright, and defendants have not moved for summary judgment on the first prong of the copyright test—actual copying. As such, the Court assumes for the purpose of this motion that actual copying occurred. *See id.* (making the same assumption). The only question before me is whether the two works are substantially similar.

While it is true that courts may resolve the question of substantial similarity at the motion to dismiss or summary judgment stage in appropriate cases, it is well settled that "[b]ecause substantial similarity is customarily an extremely close question of fact, summary judgment has traditionally been frowned upon in copyright litigation." *Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972, 977 (2d Cir. 1980) (internal citations omitted); *see also Warner Bros. Inc. v. Am. Broad. Cos., Inc.*, 720 F.2d 231, 240 (2d Cir. 1983); *Estate of Smith v. Cash Money Records, Inc.*, 253 F. Supp. 3d 737, 746 (S.D.N.Y. 2017); *Crane v. Poetic Prod. Ltd.*, 593 F. Supp. 2d 585, 591 (S.D.N.Y.), *aff'd*, 351 F. App'x 516 (2d Cir. 2009). That said, the Second

11

Circuit has instructed that a court may "resolve [the question of substantial similarity] as a matter of law, 'either because the similarity between two works concerns *only* non-copyrightable elements of the plaintiff's work, or because no reasonable jury, properly instructed, could find that the two works are substantially similar.'" *Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 63 (2d Cir. 2010) (emphasis added) (quoting *Warner Bros.*, 720 F.2d at 240). Put differently, a court may grant summary judgment only when "the lack of substantial similarity is so clear as to fall outside the range of reasonably disputed fact questions requiring resolution by a jury." *Warner Bros.*, 720 F.2d at 239.

In a copyright case in which the disputed works are entirely protectable, "[t]he standard test for substantial similarity between two items is whether an ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard [the] aesthetic appeal as the same.'" *Gaito Architecture*, 602 F.3d at 66 (alteration in original) (quoting *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 111 (2d Cir. 2001)). This test, often referred to as the "ordinary observer test," asks whether "an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work." *Knitwaves, Inc. v. Lollytogs Ltd.*, 71 F.3d 996, 1002 (2d Cir. 1995). But when a work contains both copyrightable and non-copyrightable material, the analysis is "more discerning." *Gaito Architecture*, 602 F.3d at 66. In such cases, the court instead "must attempt to extract the unprotectible elements from . . . consideration and ask whether the protectible elements, standing alone, are substantially similar." (internal quotation marks omitted)) (quoting *Knitwaves, Inc.*, 71 F.3d at 1002). Put differently, the Court must consider the alleged similarities, extracting that which is not subject to copyright protection, and determine whether the remaining similarities are substantial. This test is often referred to as the "more discerning ordinary observer test." *King Zak Indus., Inc. v. Toys 4 U USA Corp.*, No. 16-CV-9676 (CS), 2017 WL 6210856, at *4 (S.D.N.Y. Dec. 8, 2017); *see also Horizon Comics Prods., Inc. v. Marvel Entm't, LLC*, 246 F. Supp. 3d 937, 941 (S.D.N.Y. 2017).

12

Even when conducting the "more discerning" version of the ordinary observer test, the Second Circuit has "disavowed any notion that 'we are required to dissect [the works] into their separate components, and compare only those elements which are in themselves copyrightable.'" *Gaito Architecture*, 602 F.3d at 66 (quoting *Knitwaves, Inc.*, 71 F.3d at 1003). Instead, the Court must be "principally guided 'by comparing the contested design's "total concept and overall feel" with that of the allegedly infringed work,' as instructed by [the Court's] 'good eyes and common sense.'" *Gaito Architecture*, 602 F.3d at 66 (internal citations omitted) (first quoting *Tufenkian Imp./Exp. Ventures, Inc. v. Einstein Moomjy, Inc.*, 338 F.3d 127, 133 (2d Cir. 2003), and then quoting *Hamil Am.*, 193 F.3d at 102).

Therefore, in reviewing defendants' motion for summary judgment, I am required to review the Play and the Musical for substantial similarity in a "more discerning" manner, excluding elements not subject to copyright protection but paying attention to "the similarities in such aspects as the total concept and feel, theme, characters, plot, sequence, pace, and setting of the" disputed works. *Williams v. Crichton*, 84 F.3d 581, 588 (2d Cir. 1996). "It is only where the points of dissimilarity exceed those that are similar and those similar are—when compared to the original work—of small import quantitatively or qualitatively that a finding of no infringement is appropriate." *Rogers v. Koons*, 960 F.2d 301, 308 (2d Cir. 1992).

## B.    Material Issues of Fact Preclude Summary Judgment

The parties largely agree that certain elements of the Play are not protected by copyright. For instance, as plaintiffs acknowledge, elements of the Play that constitute historical facts are not subject to copyright protection. *See Hoehling*, 618 F.2d at 978 (explaining that when "the idea at issue is an interpretation of an historical event, our cases hold that such interpretations are not copyrightable as a matter of law"); *Porto v. Guirgis*, 659 F. Supp. 2d 597, 611 (S.D.N.Y. 2009) ("[H]istorical events, facts, stock themes, and typically-portrayed

13

characters receive no copyright protection."); *see also Effie Film, LLC v. Pomerance*, 909 F.

Supp. 2d 273, 298 (S.D.N.Y. 2012). As the Second Circuit explained in *Hoehling*,

> A grant of copyright in a published work secures for its
> author a limited monopoly over the expression it contains. The
> copyright provides a financial incentive to those who would add to
> the corpus of existing knowledge by creating original works.
> Nevertheless, the protection afforded the copyright holder has
> never extended to history, be it documented fact or explanatory
> hypothesis. The rationale for this doctrine is that the cause of
> knowledge is best served when history is the common property of
> all, and each generation remains free to draw upon the discoveries
> and insights of the past. Accordingly, the scope of copyright in
> historical accounts is narrow indeed, embracing no more than the
> author's original expression of particular facts and theories already
> in the public domain.

*Hoehling*, 618 F.2d at 974. As the Court explained, the exclusion of historical facts recognizes

"the 'public benefit in encouraging the development of historical and biographical works and

their public distribution.'" *Id.* at 978 (quoting *Rosemont Enters., Inc. v. Random House, Inc.*,

366 F.2d 303 (2d Cir. 1966)). As such, secondary authors are typically given a "relatively free

hand to build upon the work of their predecessors." *Id.* at 980.

Similarly, it is well settled that "[c]opyright protection does not extend to '*scenes*

*a faire*, sequences of events that 'necessarily result from the choices of a setting or situation.'"

*Porto*, 659 F. Supp. 2d at 611 (quoting *Williams*, 84 F.3d at 587). For example, "elements of a

work that are 'indispensable, or at least standard, in the treatment of a given topic'—like

cowboys, bank robbers, and shootouts in stories of the American West—get no protection."

*Zalewski v. Cicero Builder Dev., Inc.*, 754 F.3d 95, 102 (2d Cir. 2014) (quoting *Hoehling*, 618

F.2d at 979).

But even in the realm of historical work, and especially in cases involving

historical fiction, the right to build on a prior author's work is not absolute. As the Second

14

Circuit went on to explain in *Hoehling*, "[i]n works devoted to historical subjects, . . . a second author may make significant use of prior work, *so long as he does not bodily appropriate the expression of another*." *Id.* at 980 (emphasis added). As Judge Oetken thoroughly explained in *Effie Film, LLC v. Pomerance*,

> [T]he significance of the *Hoehling* rule here is that, to the extent that the disputed works are similar with respect to plot structure, individual scenes, settings, or features of individual characters that reflect historical facts or interpretations, those similarities do not count toward substantial similarity analysis. Rather, substantial similarity must be shown through reference to the creative aspects of these works, such as fictional plot developments, scenes, settings, and character traits. Substantial similarity can also be demonstrated through reference to creative devices that span the protectible and unprotectible elements of the works and transform the atomized facts into a meaningful, fictional story.

909 F. Supp. 2d at 298; *see also* 1–2 Nimmer on Copyright § 2.11 ("If and to the extent an otherwise factual account contains fictional elements, or fictionalized versions of factual events, such will be regarded as protectible by copyright."). Put differently, to the extent that plaintiffs seek to assert copyright protection over the historical underpinnings of the Play, their claim must fail. But the fictionalized elements that are built on top of the historical skeleton are subject to copyright protection, and these fictionalized elements form the basis of plaintiffs' claim.

In their Submission and opposition papers, plaintiffs have identified a number of alleged similarities that make summary judgment inappropriate in this case. Among these similarities, plaintiffs highlight various elements that are shared between the two works including portions of the plot, specific characters and their development, particular scenes, and themes. A suggestion has been made that these elements can largely be traced back to the historical underpinnings of the story, making characters like Anna/Anya and the Dowager Empress non-copyrightable. But even accepting defendants' description of the historical record

15

on its face and dismissing it from the analysis,[8] the two works share significant commonalities
not traced to any documented historical record.

Defendants correctly note that certain elements of the Anna/Anya character are
not subject to copyright protection. For instance, it is a matter of historical record that a woman
named Anna Anderson, who suffered from amnesia and other assorted mental health issues,
appeared in Germany after the Russian revolution claiming to be Anastasia Romanov. It is also
true that this woman met with certain exiled members of the Russian royal family, gaining
recognition from some, but ultimately failed to garner widespread acknowledgment from the
most relevant family members or from the public. *See* Memorandum of Law, ECF 42, at A24–
25. These historical facts, if recognized by the Court, would not be copyrightable. *See*
*Hoehling*, 618 F.2d at 974.

But Plaintiffs' claim is not premised on maintaining copyright protection over
these historical facts, and a close reading of the Play and the Musical reveals crucial elements of
both that cannot be traced back to the historical record. For instance, both the Play and the
Musical depict the Anna/Anya character being recruited into a conspiracy to convince the world

---

[8] To support their claim that large portions of the Play are non-copyrightable historical facts, defendants have
submitted extensive historical documents, including a series of news articles from the mid-Twentieth Century and a
book written by Gleb Botkin, who supposedly knew and supported Anna Anderson. *See* Memorandum of Law,
ECF 42, at App'x 3. Addressing these historical facts, the parties present a threshold dispute regarding how the
Court should approach such evidence. Plaintiffs argue that the Court should not take judicial notice of the historical
facts presented in defendants' submissions because they are based largely on hearsay, are not supported by expert
testimony or submissions, and have otherwise not been proven as a matter of law. *See* Memo of Law in Opposition,
ECF 49, Ex. 1, at 46–48.

    On the other hand, citing *Effie Film*, defendants claim that the Court may—indeed, must—take judicial
notice of such facts because they are undisputed. *See* Response to 56.1 Statement, ECF 49, Ex. 2, at ¶¶ 21–67; *see
also Effie Film*, 909 F. Supp. 2d at 299 (concluding that Fed. R. Evid. 201 "permits judicial notice of historical
facts"); Weinstein's Federal Evidence, § 201.12[5] at 201–44 ("Courts may take judicial notice of historical facts
revealed in authoritative writings when there is no dispute about the authenticity of the materials and judicial notice
is limited to factual matters that are incontrovertible."); 1–4 Weinstein's Evidence Manual § 4.02 (explaining that
courts may "take judicial notice of facts that various newspapers, magazines, and books were published *solely* as an
indication of information in the public realm at the time, not whether the contents of those articles were, in fact,
true" (emphasis added)).

    The Court need not resolve this dispute. As explained herein, even stretching defendants' summary of the
historical record to its breaking point, plaintiffs have identified a number of similarities between the Play and the
Musical that cannot be traced back to history. These similarities make summary judgment inappropriate.

that she is Anastasia Romanov, and both works include depictions of the Anna/Anya character being tutored on Romanov history and royal behavior. This portion of both works has no basis in the historical record identified by defendants. Similarly both works hinge on a much-anticipated meeting between Anna/Anya and her supposed grandmother, the Dowager Empress. Defendants are correct that the Empress is an historical figure, and her character's existence is therefore not subject to copyright protection. *See Hoehling*, 618 F.2d at 974. Neither party disputes this precept of copyright law. Plaintiffs' claim, however, is that the characters are portrayed in a way that is not based on any historical account. For instance, in both the Play and the Musical, the Empress is portrayed as cold and hardened by the loss of her family and is initially reluctant to meet with Anna/Anya or to take her claim seriously. In both works, Anna/Anya must convince the Empress of her parentage, and both scenes culminate in the Empress and Anna/Anya sharing an emotionally resonate scene in which the Empress recognizes her granddaughter and agrees to support her.[9]  Of course, specific elements of both scenes differ, but the cores of the scenes are similar, or at least arguably so. And while there is some indication that the real Anna Anderson wanted to meet the Dowager Empress, Anastasia's grandmother, there is no evidence that such a meeting ever took place. *Id*. at A25. By all accounts, this expression was entirely fictionalized by the authors of the Play, clearly rendering it protectable by the copyright laws.

---

[9] Defendants claim that the two depictions of the Empress, who is a historical figure, are entirely different. This too is not supported by a close reading of the Play and the Musical. In the Play, the Empress describes one member of the family as "gullible" for believing Anna's story, and then treats Anna harshly during their initial interaction. *See* Declaration of Joshua L. Simmons, ECF 44, Ex. A, at 56, 59–64. So too in the Musical, where Anya initially describes the Empress as "cruel," and the Empress later explains her demeanor by stating that she "has found solace in [her] bitterness." *See* Declaration of Joshua L. Simmons, ECF 44, Ex. D, at 112. And in both the Play and the Musical, the Empress ultimately recognizes Anna/Anya as Anastasia after she reveals knowledge of intimate details of Anastasia's childhood. Plaintiffs argue that this scene depicts a transformation from a hardened character to a warm and embracing one, and a reasonable juror could credit plaintiffs' interpretation of the Dowager Empress character.

McNally, the principal author of the Musical, suggests that he chose to focus on a meeting with the Dowager Empress not because of its expression in the Play, but "because grandmothers are a very powerful figure to [him]." *See* Declaration of Dale M. Cendali, ECF 39, Ex. N, at 178:15–19. He also claims that he has used similar grandmother characters in his prior works. *See* Declaration of Joshua L. Simmons, ECF 44, ¶ 9. Defendants also claim that "the concept of a protagonist seeking out their grandmother for help is a common trope of American musicals," *see* Memorandum of Law, ECF 42, at, 24, and the concept of a recognition scene is therefore a non-copyrightable *scene a faire*, *see Zalewski*, 754 F.3d at 102. But these arguments misconceive both plaintiffs' claim and the Court's role at this stage in the litigation. The fact that Anna Anderson might have logically sought out her grandmother and that other musicals contain grandmother characters is beside the point. Plaintiffs do not claim they hold a copyright over a generic grandmother character or a generic recognition scene. Plaintiffs' claim instead focuses on the specific expressions at work here—a crucial, cathartic reunion between Anna/Anya and her supposed grandmother that, while perhaps a logical path for the story to take, arguably "transform[ed] the atomized facts into a meaningful, fictional story," *see Effie Film*, 909 F. Supp. 2d at 298, that have no basis in the historical record. Moreover, the source of McNally's inspiration calls for credibility assessments that I may not entertain at this stage. *See Amnesty Am.,* 361 F.3d at 122.

Among other alleged similarities, plaintiffs also cite the climax of both the Play and the Musical, both of which hinge on a ceremony intended to present Anna/Anya to the world as Anastasia. In both works, Anna/Anya is torn between accepting the title of Anastasia and the wealth and privilege that comes with it, and living a simple and private life. Both the Play and the Musical portray Anna/Anya making an off-stage decision to reject royalty and wealth, in favor of a simple life. As with the meeting between Anastasia and the Empress, the presentation scene has no apparent basis in the historical record. In response, defendants argue that the two

18

scenes contain nuanced differences and, as above, that the concept of a presentation scene is a *scene a faire* that is not subject to copyright protection. But once again, defendants misconceive plaintiffs' claim. Just as with the meeting between Anastasia and the Empress, plaintiffs do not claim to hold a copyright to the *idea* of a presentation scene. Plaintiffs' claim is limited to a particular expression of a presentation scene, constructed in a particular way, which can be protected by copyright. *Porto*, 659 F. Supp. 2d at 610. For substantially the same reasons identified above, a close examination of the two works and the parties' submissions reveals a dispute of material fact not appropriate for resolution by the Court on summary judgment.

Defendants rely heavily on the fact that the Play and Musical are different in "total concept and feel." *See, e.g.*, *Williams*, 84 F.3d at 588. True, one is a musical and one is a play, and the two works thus are of different genres. Also, the Musical is more comical, light-hearted, and set at a faster pace than the Play, which is slower, dramatic, and takes place largely in a single set. However, it is arguable that the "total concept and feel" differs materially beyond the fact that one is a musical and the other, a play. *See Williams*, 84 F.3d at 588 (listing "total concept and feel" alongside "theme, characters, plot, sequence, pace, and setting"). Furthermore, as the Second Circuit has recognized, "[t]he total concept and feel test . . . is simply not helpful in analyzing works that, because of their different genres and media, must necessarily have a different concept and feel." *Castle Rock Entm't, Inc. v. Carol Pub. Grp., Inc.*, 150 F.3d 132, 140 (2d Cir. 1998).

Defendants also cite a number of cases in which courts have found that more similar works than those at issue here were not substantially similar. These cases are largely distinguishable on their facts. For instance, the Court in *Effie Film* considered the similarities between a film and three screenplays. *Effie Film*, 909 F. Supp. 2d at 278. The Court identified five shared scenes: "(1) the first meeting between John and Effie; (2) the first time Effie and John attempt intimacy; (3) Effie being rebuked for wearing an inappropriate dress; (4) the trip to

19

Venice; and (5) John's discovery of the burgeoning affair between Effie and Millais while in Scotland." *Id.* at 304. But the scenes discussed in *Effie Film* involved significant portions that the Court extracted from the analysis based on the historical record, and many of the common scenes varied in their importance to the overall plot. *Id.* at 304–06. Here, by contrast, the scenes discussed previously are crucial to the plot of the Play and Musical, and are mainly fictionalized with no basis in the historical record.

Defendants also cite *Porto v. Guirgis*, a case involving a fictionalized account of the trial of Judas Iscariot contained in both a novel and a subsequent play, in which the court granted summary judgment and found that the two works were not substantially similar. *See* 659 F. Supp. 2d 597. But the Court in *Porto* found that the *idea* of Judas Iscariot's trial itself was non-copyrightable, and the characters involved were far more grounded in the biblical narrative than those at issue here. *See id.* at 610–14. And unlike *Porto*, plaintiffs' claim is not based on "highly generalized descriptions of the two works whose details and patterns turn out to be quite different from one another." *Id.* at 611.

"The test for infringement of a copyright is of necessity vague," *Gaito Architecture*, 602 F.3d at 63 (internal quotation marks omitted) (quoting *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.*, 274 F.2d 487, 489 (2d Cir. 1960)), making summary judgment problematic. "The determination of the extent of similarity that will constitute a *substantial*, and hence infringing, similarity presents one of the most difficult questions in copyright law, and one that is the least susceptible of helpful generalizations." 4–13 Nimmer on Copyright § 13.03 (2009). I must engage in a "detailed examination of the works themselves," *Williams*, 84 F.3d at 583 (internal quotation marks omitted) (quoting *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 49 (2d Cir. 1986), which "supersede and control contrary descriptions of them," *Gaito Architecture*, 602 F.3d at 63 (internal quotation marks omitted) (quoting *Walker*, 784 F.2d at 52). Comparisons to unrelated cases do not help. My inquiry must be centered on the works

20

themselves. I hold that there are material facts in dispute, and that summary judgment is inappropriate.

## Conclusion

For the reasons discussed in this Opinion, defendants' motion for summary judgment is denied. The clerk shall mark the motion terminated (ECF 41). The parties shall appear for a status conference on April 13, 2018 at 10:00 a.m. to chart further progress in the case and discuss what discovery remains, if any, and if none remains, to set a trial date.

SO ORDERED.

Dated:        April 2, 2018
              New York, New York

ALVIN K. HELLERSTEIN
United States District Judge